UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

TOMMY SIMMONS

                               Plaintiff.

                  -against-

THE CITY OF NEW YORK,
CAPTAIN DESMOND MYERS (Shield 1320),
ADRIAN GUERRA, SR., ADMINISTRATOR FOR
THE ESTATE OF CORRECTION OFFICER ADRIAN
GUERRA (Shield 10154), CORRECTION OFFICER
THOMAS DIFIORE (Shield 12520),
CORRECTION OFFICER JASON CATALANOTTO
(Shield 8523), CORRECTION OFFICER
LAURENT ALADIN (Shield 7920)
in their individual and official capacities.

                            Defendants.

-------------------------------------------------------------x

**THIRD AMENDED
COMPLAINT
AND DEMAND FOR
JURY TRIAL**

**15CV03489(NRB)**

Plaintiff, TOMMY SIMMONS[1], by and through his attorneys, **Fisher & Byrialsen,**

**PLLC,** complaining of the defendants herein, respectfully shows the Court and alleges:


**PRELIMINARY STATEMENT**

       1.      This is a civil rights action in which the Plaintiff, Tommy Simmons, seeks relief

for defendants' violations, under color of state law, of his rights, privileges and immunities

---

[1] In the original complaint, Mr. Simmons' name was misspelled.   Mr. Simmons will be referred herein out by his legal name, Tommy Simmons.

1

secured by the 42 U.S.C. § 1983; and the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

2.     The New York City Department of Correction has an inadequate use of force policy.  The New York City Department of Correction trains its correctional officers in such inadequate use of force policies.  The New York City Department of Correction's inadequate use of force policy has resulted in documented constitutional violations.  In this case, Defendants Myers, Guerra,[2] Difiore, Catalanotto, and Aladin acted in conformity with the New York City Department of Correction's inadequate use of force policy.  As a result, Mr. Simmons was subjected to excessive and unreasonable force and sustained serious physical and emotional injury.

3.     Mr. Simmons seeks (i) compensatory damages for physical injury, psychological and emotional distress, and other financial losses caused by the illegal actions of the defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional laws; and (iii) such other and further relief, including costs and attorney's fees, as this court deems equitable and just.

## JURISDICTION

4.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution.

---

[2] Corrections Officer Adrian Guerra is deceased.  Adrian Guerra, Sr. is the administrator of the Estate of Adrian Guerra. All reference to Defendant Guerra, here on out, is to Adrian Guerra, Sr., Administrator of the Estate of Adrian Guerra.

5.      Jurisdiction is invoked herein pursuant to the aforementioned statutory and constitutional provisions and pursuant to 28 U.S.C. §§ 1331, 1343, this being an action seeking redress for the violation of the plaintiff's constitutional and civil rights.


## VENUE

6.      Venue is properly laid in this District under 28 U.S.C. §1391(b), this being the District in which the claim arose.


## TRIAL BY JURY

7.      Plaintiff demands a trial by jury on each and every one of his claims as pled herein pursuant to Fed., R. Civ. P. 38(b).


## PARTIES

8.      Mr. Simmons is currently a resident of Bronx County in the State of New York.

9.      At all times relevant hereto defendant New York City ("NYC") was and is a municipality of the State of New York and owns, operates, manages, directs, and controls the New York City Department of Correction, (hereinafter, "NYC DOC"), which employs Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin.  At all times relevant to this complaint, Mr. Simmons resided at the Rikers Island Correctional Facility (hereinafter, "Rikers Island").  Rikers Island is made up of ten different correctional facilities.  The ten correctional facilities on Rikers Island are managed, funded, and operated by the New York City Department

of Correction, an agency of the City of New York.  Rikers Island's ten correctional facilities are institutions within the meaning of 42 U.S.C. § 1997.

10.     At all times relevant to this action, Defendant Correction Officers Myers, Guerra, Difiore, Catalanotto, and Aladin, were correction officers employed by the NYC DOC, an agency of NYC, and acting under color of state law.  They are being sued in their individual and official capacities.  Adrian Guerra is deceased.  The claims against Adrian Guerra survive him. Adrian Guerra, Sr. is the administrator of Adrian Guerra's estate and is substituted as a party for Adrian Guerra.  All references to Adrian Guerra are here on out referencing Adrian Guerra, Sr., Administrator of the Estate of Adrian Guerra.

11.     At all times relevant hereto and in all their actions described herein, Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin were acting under color of statutes, ordinances, regulations, policies, customs, and usages of the NYC DOC and NYC, pursuant to their authority as employees, servants, and agents of the NYC DOC within the scope of employment and incidental to their otherwise lawful duties and functions as employees, servants, agents and correction officers.

12.     NYC was responsible for the hiring, training, supervision, discipline, retention and promotion of the correction officers, sergeants and/or employees of the NYC DOC.

**STATEMENT OF FACTS**

A.   **THE BRUTAL ASSAULT OF MR. SIMMON BY DEFENDANTS MYERS,**
      **GUERRA, DIFIORE, CATALANOTTO, AND ALADIN**

13.   On December 8, 2014, Mr. Simmons was in the custody of the NYC DOC.

14.   On that day, Mr. Simmons was in an intake cell of area C-95 in the Anna M.

Kross Center Facility (hereinafter, "A.M.K.C.) located at 18-18 Hazen Street East Elmhurst, NY

11370 of Rikers Island in Queens, New York.

15.   On that day, Mr. Simmons was told by Defendant Myers that he would be

transferred from the C-95 area of A.M.K.C. to an area known as 15 Lower Dorm.

16.   Mr. Simmons alerted Defendant Myers that an inmate that was then housed in 15

Lower Dorm had previously threatened Mr. Simmons' life and that he felt he would be in danger

if he was transferred there.

17.   In reaction to Mr. Simmons' statements, Defendant Myers threatened Mr.

Simmons, stating in sum and substance, "even if I have to beat your ass and drag you to 15

Lower Dorm in handcuffs, you will be going to the housing area."

18.   Mr. Simmons proceeded to repeatedly tell Defendant Myers that he feared for his

life if he was transferred there.

19.   While Mr. Simmons and Defendant Myers were in the intake cell together,

Defendants Guerra, Difiore, Catalanotto, and Aladin arrived.

20.   Without provocation, Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin

grabbed Mr. Simmons' arm.

21.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin punched Mr. Simmons repeatedly about the head, arms, and pelvis.

22.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin threw Mr. Simmons to the ground.

23.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin repeatedly kicked and punched his head, back and legs.

24.     Mr. Simmons was ultimately rendered unconscious.

25.     As a result of the assault, Mr. Simmons experienced substantial pain to his head, back, pelvis, and extremities.

26.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin called Emergency Medical Services (hereinafter, "EMS").

27.     Having knowledge that Mr. Simmons had a prior history of seizure disorders, Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin made patently false statements to EMS that Mr. Simmons was unconscious and/or injured as a result of a seizure.

28.     None of the Defendants were reported by EMS to be injured in any way.

B.      **MR. SIMMONS SUBSTANTIAL PAIN AND SUFFERING**

29.     EMS was called to The AMKC facility of Rikers Island at approximately 4:00 p.m. on December 8, 2014.

30.     Ms. Simmons was found by EMS on the floor bleeding, bruised, and in

excruciating pain.  Mr. Simmons had contusions on his face and he was shaking in pain.  Mr. Simmons was complaining that he had been beaten up by five officers.

31.     When EMS arrived at the scene, Mr. Simmons could not stand.  He was put in a c-collar and removed from the intake cell on a stretcher.

32.     Mr. Simmons was taken from Rikers Island to Elmhurst Hospital Center.  Mr. Simmons lost consciousness while on the ride to the hospital.

33.     Mr. Simmons regained consciousness in Elmhurst Hospital Center.

34.     Mr. Simmons underwent extensive diagnostic testing.  Mr. Simmons' CT-scan revealed the following injuries: (1) transverse process fractures in his left L3 and L4 lumbar spine, (2) annulus bulges and disc herniation at L5/S1, (3) blunt force trauma to the left side of his pelvis, (4) numbness of his left leg, (5) urinary retention, and (6) extensive contusions to the face.

35.     The following day, December 9, 2014, Mr. Simmons was admitted to Bellevue Hospital for continued treatment and was not discharged until December 17, 2014 at 3:54 p. m..

36.     At Bellevue Hospital, a MRI was taken of Mr. Simmons' spine.   The MRI showed the same L3-L4 fractures with L5-S1 disc herniations as Elmhurst's CT scans.

37.     Mr. Simmons participated in physical therapy while at Bellevue Hospital.

38.     Mr. Simmons sustained blunt force trauma to his pelvic region during his brutal assault by Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin.  As a result of such pelvic trauma, Mr. Simmons could not urinate.  Mr. Simmons required the use of a catheter to urinate from December 8, 2014 until December 17, 2014.   Moreover, as a result of such pelvic

trauma, Mr. Simmons could not defecate for several days causing substantial pain in his bowels.

39.     As a result of Mr. Simmons' brutal assault by Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin, he was unable to walk without assistance and he was issued a wheelchair.

40.     On December 18, 2014, Mr. Simmons made a formal grievance to NYC DOC of his injuries upon his return from Bellevue Hospital. *See* **Exhibit A, Grievance**.

41.     When Mr. Simmons was discharged from Bellevue Hospital, he required substantial medical attention while in the custody of NYC DOC.  Mr. Simmons could not get out of his wheelchair or go to bed without assistance of correction officers due to extreme pain.  Mr. Simmons complained of sharp and throbbing pain in his lower back.

42.     Mr. Simmons required the assistance of a wheelchair from December 8, 2014 until December 29, 2014.  Thereafter, Mr. Simmons was issued a cane.  Mr. Simmons relied on use of a cane for several months.

43.     Nearly a year after his assault, Mr. Simmons continued to feel excruciating pain in his lower back.  Mr. Simmons was issued a back brace, weighing over seven pounds, which he wore every day.

44.     As a result of the unprovoked and brutal assault by Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin, Mr. Simmons not only suffered from severe physical injury but feared for his safety and wellbeing and suffered anxiety and severe emotional distress.

C.    **THE DEPARTMENT OF CORRECTION'S INADEQUATE POLICIES AND A PATTERN AND PRACTICE OF FAILING TO TRAIN PROPER USE OF FORCE**

1.    **Well-documented Pattern and Practice of Inadequate Use of Force Policy**

45.    The New York City Department of Correction's deliberate indifference to the known serious harm, and risk of serious harm, to Mr. Simmons, is exhibited by the long history of violence at Rikers Island.

46.    The New York City Department of Correction's deliberate indifference to the known serious harm, and risk of serious harm, to Mr. Simmons, is exhibited by its ongoing failure to, *inter alia*,

a.    select and promote a sufficient number of managers and supervisors with the necessary skills and commitment to address the extraordinarily high levels of violence perpetrated against and among inmates like Mr. Simmons,

b.    ensure that use of force incidents involving inmates like Mr. Simmons are properly documented and investigated,

c.    ensure that New York City Department of Correction staff are appropriately disciplined for utilizing excessive and unnecessary force and for attempting to cover up such use of force,

d.    implement measures to ensure that inmates like Mr. Simmons are appropriately supervised,

e.    maintain an effective inmate grievance system, and, among other things,

f.      ensure that New York City Department of Correction staff working with inmates, like Mr. Simmons, have effective training programs on use of force.

47.     Plain and simple, the New York City Department of Correction's use of force policy is inadequate and the agency continues to fail to train its officers, like Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin, in proper procedures and fails to screen and hire officers that are properly qualified for the requirements of the job.

48.     Mr. Simmons is not the only inmate at Rikers Island who has been subjected to brutality by New York City Correction Officers.  The pattern of brutality in NYC DOC facilities is deeply entrenched and well documented.  Defendants were put on notice of the systemic use of excessive and inappropriate force by New York City Department of Correction staff, and the culture of violence that surrounds it, by a series of use of force related class action lawsuits brought by inmates dating back to the early 1980s.

49.     In 1990, inmates first obtained injunctive relief in *Fisher v. Koehler*, 83-CV-2128 (S.D.N.Y.), a class action addressing excessive use of force in the Correctional Institution for Men (hereinafter,"C.I.F.M."), a Rikers Island facility now known as the Eric M. Taylor Center (hereinafter, "E.M.T.C.").  Although that injunction remains in effect, its terms are apparently limited to E.M.T.C.

50.     In the subsequent years, classes of plaintiffs obtained injunctive relief reducing excessive and unnecessary use of force in the Bellevue Prison Psychiatric Ward (*Reynolds v. Ward*, 81-CV-101 (S.D.N.Y. 1990) (order and consent judgment)); in the Brooklyn House of Detention (*Jackson v. Montemango*, 85-CV-2384 (E.D.N.Y.) (order approving stipulation for

10

entry of judgment)); and in the Central Punitive Segregation Unit ("CPSU") (*Sheppard v. Phoenix*, 91-CV-4148 (S.D.N.Y. 1998) (order approving stipulation for entry of judgment)).  In all of these cases, the Department narrowly limited relief to the particular facilities that were the subjects of the lawsuits and allowed unconstitutional practices to resume once those orders expired.

51.     Then, in *Ingles v. Toro*, 01-CV-8279 (S.D.N.Y. 2006), a class of inmates obtained a settlement that purported to offer system-wide relief, however, the Department failed to enforce the reforms agreed to in that matter and continued the same unconstitutional use of force practices.

52.     More recently, in *Nunez v. City of New York*, 11-CV-5845(S.D.N.Y. 2011), another group of plaintiffs filed a class action lawsuit alleging that "the City's jails remain afflicted by the same culture of violence, the same failure of accountability, and the same deliberate indifference and active acceptance.  Conditions in the jails have deteriorated markedly. Despite the training that its staff is supposed to receive, correction officers still mete out violence to inflict pain rather than to maintain order." *See* **Exhibit B,** ***Nunez v. City of New York,*** **Second Amended Complaint**, Dkt No. 34, p. 4, ¶ 5.

53.     NYC and NYC DOC are on notice as to the number, frequency, and severity of use of force incidents in NYC DOC facilities.  The NYC DOC receives compilation reports documenting violent incidents, including reports of staff use of force.

54.     Within the last 15 years senior supervisors and NYC DOC staff have been sued

repeatedly by inmates alleging staff beatings and cover-up:[3]

      a. *Reynolds v. City of New York*, 11 Civ. 621 (S.D.N.Y.) (Assault in George Motchan Detention Center (hereinafter, "G.M.D.C.") resulting in shoulder fracture and loss of consciousness; settled for $200,500);

      b. *Mull v. City of New York*,08 Civ, 8854 (S.D.N.Y.) (Assault in A.M.K.C. resulting in diffuse axonal injury to brain, partial loss of eyesight, partial loss of hearing and requiring the victim to take seizure medications; settled for $550,000);

      c. *Bellviille v. City of New York*, 09 Civ. 8090 (S.D.N.Y.) (Assault at G.M.D.C. and Robert N. Davoren Complex (hereinafter, "R.N.D.C.") resulting in facial fracture; settled for $350,000);

      d. *Youngblood v. Baldwin*, 08 Civ. 5982 (S.D.N.Y.) (Assault at George R. Vierno Center (hereinafter, "G.R.V.C.") resulting in skull laceration and broken nose; settled for $240,000);

      e. *Williams v. City of New York*, 07 Civ. 1105(S.D.N.Y.) (Assault in Otis Bantum Correctional Center (hereinafter, "O.B.C.C.") resulting in a fractured jaw and facial bones and torn earlobe; settled for $202,500);

      f. *Williams v. City of New York*, 09 Civ. 5734(S.D.N.Y.) (Assault in R.N.D.C. resulting in laceration to head; settled for $87,500);

      g. *Lee v. Perez*, 09 Civ. 3134 (S.D.N.Y.) (Assault at North Infirmary Command (hereinafter, "N.I.C.") resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);

      h. *Shuford v. City of New York,* 09 Civ. 945 (S.D.N.Y.)(Two Assaults at R.N.D.C. resulting in facial fractures; settled for $375,000);

      i. *Diaz v. City of New York,* 09 Civ. 945 (S.D.N.Y.) (Assaults involving two inmates, one at A.M.K.C. and one at O.B.C.C.; settled for $400,000 and $450,000, respectfully);

      j. *Lugo v. City of New York*, 08 Civ. 2931 (S.D.N.Y.) (Assault at N.I.C. resulting in orbital fracture; settled for $185,000);

---

[3] The compilation of cases is referenced in the class action complaint, *Nunez v. City of New York*, 11-CV-5845(S.D.N.Y. 2011). *See* Amended Complaint, Dkt No. 15, p. 28-30, ¶ 45.

      k.   *Cuadrado v. City of New York*, 07 Civ. 1447 (S.D.N.Y.) (Assault at G.M.D.C. resulting in orbital fracture; settled for $175,000);

      l.   *Pischeottola v. City of New York,* 06 Civ. 2505 (S.D.N.Y.) (Assault at R.N.D.C. resulting in punctured lung requiring chest tube; settled $150,000);

      m.  *Rice v. N.Y.C.D.O.C.*, 03 Civ. 582 (S.D.N.Y.) (Assaults of two inmates at George R. Vierno Center (hereinafter, "G.R.V.C.") resulting in a collapsed lung and contusion hematomas in one case and in neck and spinal cord injuries causing a permanent stutter in the other case; settled for $255,000 and $590,000, respectfully);

      n.   *Joseph v. N.Y.C.D.O.C.*, 02 Civ. 9219 (S.D.N.Y.) (Assaults at G.R.V.C. resulting in orbital fracture; settled for $375,000).

55.     On August 4, 2014 the United States Attorney's Office for the Southern District of New York reported findings of an investigation conducted at Rikers Island pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 and Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141. *See* **Exhibit C**, **DOJ Findings Letter**.  The investigation centered on whether the New York City Department of Correction ("DOC") adequately protects adolescents from excessive and unnecessary use of force by DOC correction officers and supervisors.  *Id*. at 1.  According to the DOJ Findings Letter,

> there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates.  In particular, we find that adolescent inmates at Rikers are not adequately protected from harm, including serious physical harm from the rampant use of unnecessary and excessive force by DOC staff.

*Id*. at 3.  The investigation also noted that while the subject investigation did not specifically investigate the use of force against adult inmate population, the "investigation suggests that the

systematic deficiencies identified in this report *may exist in equal measure at the other jails on Rikers*." *Id*. at 3 (emphasis added).

56.     Numerous correction officers have been charged, indicted, and fired for excessive force and causing substantial pain and suffering to inmates, similar to this case.

**2.      Well-Documented Deliberate Indifference by New York City and its agency New York City Department of Correction of the Constitutionally Inadequate Use of Force Policy and Failure to Train, Discipline or Supervise Proper Use of Force Procedures**

57.     It is not only clear that New York City Department of Correction's excessive force policy is constitutionally inadequate, it is also clear that that NYC DOC continues to be deliberately indifferent about the policy's inadequacies and improper training, discipline, and supervision of correction officers.

58.     After, Mr. Simmons' brutal assault on December 8, 2014, the United States' Attorney Preet Bharara, on June 10, 2015, brought civil rights charges under docket 15cr360(LAP) against Correction Officer Brian Coll for the December 2012 death of Ronald Spear, a pre-trial detainee at Rikers Island.[4]  Officer Coll was charged with causing injury to Mr. Spear by repeatedly kicking him in the head while he was fully restrained and lying prone on the floor.  Mr. Spear died shortly after the attack.   Manhattan U.S. Attorney Preet Bharara said:

> Ronald Spear's death at Rikers Island in December 2012 was a tragedy that should never have happened.  As alleged, his tragic death was the direct result of Correction Officer Brian Coll's unconstitutional beating.  Repeatedly kicking a downed inmate in the head and then picking up and dropping his head on the ground as he lay helpless, as Correction

---

[4] *See* https://www.justice.gov/usao-sdny/pr/manhattan-us-attorney-announces-new-civil-rights-charges-beating-death-rikers-island

Officer Coll is alleged to have done, had deadly consequences for Ronald Spear. [5] Spear's autopsy was conducted at the Bronx Office of the Chief Medical Examiner. The autopsy revealed that Spear had three recent contusions on his skull, including a "brain bleed" caused by blunt force impact to the head, consistent with Spear being kicked in the head while he was lying prone on the ground. The Medical Examiner conducting the autopsy concluded that the cause of death was "hypertensive cardiovascular disease" with "physical altercation including blunt force trauma to head" and diabetes as contributing factors and ruled the death a homicide. The assault by Officer Coll was therefore, as alleged, a proximate cause of Spear's death. Officer Coll was found guilty at trial and is awaiting sentencing.

59.     The actions of Officer Coll in the matter *United States v. Croll*, 15cr360(LAP), and the Defendants in this case are eerily similar and undoubtedly a result of the same pattern and practice of ineffective, improper and unconstitutional training of officers pursuant to inadequate use of force procedures.

60.     The case of *United States v. Croll*, 15cr360(LAP) and class actions, like *Nunez et al. v. City of New York et al. 11 Civ. 5845 (LTS)(JCF)*, have put both NYC and NYC DOC on notice of deliberate indifference to inadequate use of force policies at Rikers Island facilities.

61.     The Complaint in *Nunez et al. v. City of New York et al. 11 Civ. 5845 (LTS)(JCF)* details the egregious indifference by NYC and its agency NYC DOC in reforming its inadequate

---

[5] *Id.*

15

use of force policy:

  a.  NYC and its agency NYC DOC have been, and continue to be, deliberately indifferent to harm to inmates like Mr. Simmons by failing to appoint a sufficient number of qualified managers and supervisors, including wardens and deputy wardens, with the necessary background, experience, and skills to meaningfully address the extraordinarily high levels of violence.  This has led to continued unnecessary and excessive staff use of force.

  b.  NYC and its agency NYC DOC have failed to adequately screen and select candidates before appointing them to senior positions.  As a result, many managers and supervisors are ill-equipped to properly oversee frontline staff and simply tolerate the excessive and unnecessary staff use of violence, instead of implementing necessary measures to curb it.

  c.  For years, NYC DOC managers and supervisors have failed to institute adequate systems, procedures, and practices to address widespread noncompliance with NYC DOC's policies, including use of force and reporting policies, and have failed to consistently hold staff accountable for their improper conduct, including failure to properly discipline or fire officers who inflict violence on inmates.

  d.  NYC and its agency NYC DOC have been deliberately indifferent to harm to inmates like Mr. Simmons by failing to ensure that use of force incidents are thoroughly

and accurately reported, recorded and investigated.  When use of force reporting is inaccurate or omitted altogether, excessive and unnecessary use of force goes undiscovered and unchallenged, which in turn leads to additional unnecessary and excessive use of force.

e.      NYC and its agency NYC DOC have failed to properly maintain and safeguard video recordings of use of force incidents. During the course of the United States' investigation, Defendants advised that they had lost or were otherwise unable to locate 35% of the video recordings of incidents requested.  Many of NYC and its agency NYC DOC' own investigative reports also note that although video was recorded, video evidence could not be found.

f.      The Department of Correction operates under a single, system-wide written use of force policy: Directive 5006 (the "Written Policy"). The Department trains all of its staff at a single Training Academy subject to a uniform curriculum. There is one centralized Integrity and Policy Division (formerly called the Investigation Division) that is responsible for uniformly investigating all reports of staff's use of force under uniform procedures. There is a similar centralized Division that is responsible for conducting all of the administrative prosecutions in the few instances where the Department concludes unnecessary and excessive force has been used. This Division also has the authority to decline to prosecute or negotiate a plea-bargain with a Department employee.

g.      NYC DOC  failed to train staff to use force in conformity with the Department's

17

own official written directives and the requirements of the United States and New York laws. Because of this systematic failure, staff has not been and is not effectively trained as to the circumstances under which force can lawfully be employed, the proper means of using force, or the amount of force that may permissibly be used. Consequently, staff regularly use force to punish or retaliate against inmates for minor or imagined offenses, use weapons or techniques in impermissible manners or on inappropriate occasions, use "street fighting" techniques not prescribed by Department directives, use items such as walkie-talkies as weapons with which to subdue inmates, use force after the need for force has ended, and use more force than is necessary under the given circumstances. Staff are not trained in minimally injurious use of force techniques, and do not receive ongoing training so that they can implement them in practice. This failure to train staff has caused and causes the deprivation of Plaintiffs' constitutional rights.

*See* **Exhibit B**.

62.     NYC and its agency NYC DOC have failed to adequately train, discipline, and supervise subordinates in proper excessive force procedure to such an extent that it has amounted to deliberate indifference to the rights of those, like Mr. Simmons, who come into contact with correctional officers, like Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin.

63.     Mr. Simmons incorporates and relies on the DOJ Findings Letter, attached herein as **Exhibit C, DOJ Findings Letter**, as evidence that the need for more or better supervision to

protect against constitutional violations was obvious prior to Mr. Simmons assault.[6]  The need is obvious because of repeated complaints of civil rights violations and the fact that the complaints were not followed by any meaningful attempt on the part of NYC or its agency NYC DOC  to investigate or prevent further incidents.

64.    The DOJ Findings Letter is relevant to establishing NYC and its agency NYC DOC's municipal liability in this case notwithstanding the age parameters of the DOJ's investigations.[7]  The DOJ specifically noted:

> Our focus on the adolescent population should not be interpreted as an exoneration of DOC practices in the jails housing adult inmates. Indeed, while we did not specifically investigate the use of force against the adult inmate population, our investigation suggests that the systemic deficiencies identified in this report may exist in equal measure at the other jails on Rikers.

See **Exhibit C**, p. 3.

65.    According to the DOJ Findings Letter,  in a review of over 200 cases of excessive force, correction officers were found to resort to "headshots," or blows to an inmate's head or facial area, too frequently;  force is used as punishment or retribution;  force is used in response to inmates' verbal altercations with officers;  use of force by specialized response teams within the jails is particularly brutal;  correction officers attempt to justify use of force by yelling "stop

---

[6] See White v. City of N.Y., 13 Civ. 7421 (KPF) (S.D.N.Y. Jul. 31, 2015) (the Court was persuaded "that Plaintiff's incorporation of the DOJ Findings Letter, which details the rampant use of excessive force at Rikers Island, nudge[s] [Plaintiff's] claims across the line from conceivable to plausible.").
[7] See White v. City of N.Y., 13 Civ. 7421 (KPF) (S.D.N.Y. Jul. 31, 2015) (The Court found that "[a]lthough the Court is cognizant that the DOJ's investigation was conducted within certain age parameters, the Court is not convinced that the distinctions make a difference at this stage.").

resisting" even when the adolescent has been completely subdued or was never resisting in the first place; and use of force is particularly common in areas without video surveillance cameras. *See* **Exhibit C**, p. 4.

66.     Furthermore, the DOJ investigation identified the following systemic deficiencies that contribute to, exacerbate, and indeed are largely responsible for the excessive and unnecessary use of force by DOC staff. Many of these systemic deficiencies also lead to the high levels of inmate violence. These deficiencies include:

a.      inadequate reporting by staff of the use of force, including false reporting; inadequate investigations into the use of force;

b.      inadequate staff discipline for inappropriate use of force;

c.      inadequate classification system for adolescent inmates;

d.      an inadequate inmate grievance system;

e.      inadequate supervision of inmates by staff;

f.      inadequate training both on use of force and on managing adolescents; and

g.      general failures by management to adequately address the extraordinarily high levels of violence perpetrated against and among the adolescent population.

*See* **Exhibit C**, p.4.

67.     The actions of Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin in this case in assaulting Mr. Simmons without provocation are the same as those instances referenced in

the DOJ Findings Letter.  Mr. Simmons' injuries were therefore caused by the same widespread

practice detailed in **Exhibit C.**


**FIRST CLAIM FOR RELIEF:**
**<u>DEPRIVATION OF FEDERAL CIVIL RIGHTS</u>**
**(General Allegations, Fourth, Eighth and Fourteenth Amendments)**

68.     Mr. Simmons repeats and reiterates the allegations set forth in the foregoing

paragraphs with the same force and effect as though fully stated herein.

69.     All of the aforementioned acts of Defendants Myers, Guerra, Difiore, Catalanotto,

and Aladin, were carried out under color of state law.

70.     All of the aforementioned acts of Defendants Myers, Guerra, Difiore, Catalanotto,

and Aladin deprived Mr. Simmons of the rights, privileges, and immunities guaranteed citizens

of the United States by the Fourth, Eighth and Fourteenth Amendments to the Constitution of the

United States including, but not limited to:

a.     the right to be free from unreasonable searches of his person,

b.     the right to be free from unreasonable seizure of his person, including

excessive force,

c.     the right to be free from deprivation of liberty without due process of law, and

d.      the right to be free from cruel and unusual punishment while under the custody

and control of NYC and its agency NYC DOC.

71.     All of the aforementioned acts were carried out in violation of 42 U.S.C. § 1983.

72.     The acts complained of were carried out by Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin in their capacities as correction officers, with the entire actual and/or apparent authority attendant thereto.

73.     The acts complained of were carried out by Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin in their capacities as correction officers, pursuant to the customs, usages, practices, procedures, and rules of NYC and the NYC DOC, all under the supervision of ranking officers of said department.

74.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice, procedure, or rule of his/her respective municipality/authority, which is forbidden by the Constitution of the United States.

75.     By these actions, Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin have deprived Plaintiff of rights secured by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution, in violation of 42 U.S.C. § 1983, for which Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin are individually and jointly liable.

## SECOND CLAIM FOR RELIEF:
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

76.     Mr. Simmons repeats, reiterates, and re-alleges each and every allegation contained in the foregoing paragraphs with the same force and effect as if fully set forth herein.

77.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin engaged in extreme

and outrageous conduct beyond all possible bounds of decency when they brutally assaulted Plaintiff.

78.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin' extreme and outrageous conduct was intended to inflict severe distress upon Plaintiff when they assaulted him.

79.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin outrageous conduct did inflict severe distress upon Plaintiff, which caused Plaintiff to suffer physical injuries, pain, anxiety and mental anguish.


**THIRD CLAIM FOR RELIEF:**
**EXCESSIVE FORCE UNDER 42 U.S.C. § 1983**

80.     Mr. Simmons repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

81.     The degree of force used by Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin was excessive, unreasonable, and unwarranted.

82.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin' actions were intentional, willful, malicious, egregious, grossly reckless and negligent, unconscionable, and unprovoked.

83.     As a result of the excessive force and brutality by the defendant officers, Mr. Simmons sustained multiple injuries to his lumbar spine, pelvis, head and body and endured serious emotional and distress and immense physical pain.

84.     All of the aforementioned acts of Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin constitute excessive force under the United States Constitution and Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin are liable for said damage.

**FOURTH CLAIM FOR RELIEF:**
**FAILURE TO INTERVENE**
**UNDER FOURTH AMENDMENT – 42 U.S.C. § 1983**

85.     Mr. Simmons repeats and reiterates the allegations set forth in the foregoing paragraphs with the same force and effect as though fully stated herein.

86.     Members of NYC DOC like Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of DOC employing unjustified and excessive force against an inmate.

87.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin were present on December 8, 2014 at the C95 Unit of the A.M.K.C. facility of Rikers Island and in the vicinity of the incident and witnessed other officers use unlawful force against plaintiff, including brutally beating Mr. Simmons about his head, back, and pelvis.

88.     Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin' violated Mr. Simmons' constitutional rights by failing to intervene in the clearly unconstitutional use of force that resulted in injury and damages.

24

## FIFTH CLAIMS FOR RELIEF:
## MUNICIPAL LIABILITY

89.     Mr. Simmons repeats and reiterates the allegations set forth in the foregoing

paragraphs with the same force and effect as though fully stated herein.

90.     The acts complained of herein were carried out by Defendants Myers, Guerra,

Difiore, Catalanotto, and Aladin in their capacities as correction officers, employees and officials

pursuant to the customs, policies, usages, practices, procedures, and rules of NYC and the NYC

DOC, all under the supervision of ranking officers of said departments.

91.     Prison administrators are constitutionally required "to take reasonable measures to

guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *Hayes v.

NYC Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996). When a jurisdiction takes a person into

custody and holds him against his will, the United States Supreme Court has held that the

Constitution "imposes upon it a corresponding duty to assume some responsibility for his safety

and general Well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (quoting

*DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 199-200 (1989));

*see also Randle v. Alexander*, 960 F. Supp. 2d 457, 471 (S.D.N.Y. 2013).  Furthermore, the

Eighth and Fourteenth Amendments forbid excessive physical force against inmates and pre-trial

detainees.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see also United States v. Walsh*,

194 F.3d 37, 48 (2d Cir. 1999).

92.     Nonetheless, prior to and following December 8, 2014, NYC and NYC DOC

developed and maintained policies or customs acknowledged by Courts, the municipality, and

25

the State as exhibiting deliberate indifference to the Constitutional rights of persons in NYC, which caused the violation of Plaintiff's rights.

93.      The NYC DOC operates under a single, system-wide written use of force policy, Directive 5006 (the "Written Policy").  The NYC DOC trains its staff at a single Training Academy subject to a uniform curriculum.  It was the policy and/or custom of NYC and NYC DOC to inadequately and improperly train, discipline, and supervise its correction officers, including the defendant officers, thereby failing to adequately discourage further constitutional violations on the part of its correction officers.

94.      There is one centralized Integrity and Policy Division (formerly called the Investigation Division) that is responsible for uniformly investigating all reports of staff's use of force under uniform procedures.  There is a central Division that is responsible for conducting all of the administrative prosecutions.  This Division also has the authority to decline to prosecute NYC DOC employees.  It was the policy and/or custom of NYC and NYC DOC to inadequately and improperly investigate complaints of misconduct against correction officers filed by inmates in DOC custody, and acts of misconduct were instead tolerated by NYC, including, but not limited to the following incidents: assault and battery, harassment, negligence, intentional infliction of emotional distress and deliberate indifference to medical needs**.**

95.      NYC and NYC DOC are on notice as to the number, frequency, and severity of use of force incidents in city jails.  The NYC DOC receives compilation reports documenting violent incidents, including reports of staff use of force.  Furthermore, within the last 15 years senior supervisors and NYC DOC staff have been sued repeatedly by inmates alleging staff

beatings and cover-up.

96.     With actual and constructive knowledge of numerous forms of published literature, incident reports, and federal complaints detailing brutal incidences of excessive force, it continues to be NYC and NYC DOC's custom, policy, usage, practice, procedure, and rule to turn a blind eye, and not in act response measures to curtail the frequency of constitutional violations.

97.     Despite the City and NYC DOC having notice of numerous instances of excessive use of force, the customs, policies, usages, practices, procedures, and rule of NYC and the NYC DOC ineffectively training correction officers, failing to conduct unbiased and thorough investigations of use of force incidents, failing to discipline staff meaningfully and promptly for misconduct to ensure general and specific deterrence, and flagrantly turning a blind eye to documented instances of injustice, constitutes deliberate indifference to the safety, well-being, and constitutional rights of Plaintiff.

98.     The foregoing customs, policies, usages, practices, procedures, and rule of NYC and the NYC DOC were the proximate cause of the constitutional violations suffered by Mr. Simmons as alleged herein.

99.     The foregoing customs, policies, usages, practices, procedures, and rule of NYC and the NYC DOC were the moving force behind the constitutional violations suffered by Mr. Simmons as alleged herein.

100.    As a result of the above described policies and customs, correction officers of NYC DOC, including Defendants Myers, Guerra, Difiore, Catalaotto, and Aladin, believed that

their actions would not be monitored by supervisory officers and that their own misconduct would not be investigated or sanctioned, but instead would be tolerated. This lack of supervision and failure to discipline created an environment where violence towards inmates was the accepted norm.

101.    Defendants Myers, Guerra, Difiore, Catalaotto, and Aladin, collectively and individually, while acting under color of state law, were directly and actively involved in violating the constitutional rights of Mr. Simmons.

102.    Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin, collectively and individually, while acting under color of state law, acquiesced in a pattern of unconstitutional conduct by subordinate officers and were directly responsible for the violation of Mr. Simmons constitutional rights.

103.    Defendants NYC, as municipal policymakers in the training and supervision of Defendants Myers, Guerra, Difiore, Catalanotto, and Aladin, have pursued a policy and custom of deliberate indifference to the rights of persons in their domain who suffer violations of their freedom to be free from cruel and unusual punishment and excessive force pursuant to the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §1983.

104.    All of the foregoing acts by Defendants deprived Mr. Simmons of federally protected rights, including, but not limited to, the right:

a.    Not to be deprived of liberty without due process of law;

b.    To be free from unreasonable search and seizure under the Fourth and Fourteenth

28

Amendments to the United States Constitution;

c.      To be protected against violations of his civil and constitutional rights;

d.      Not to have cruel and unusual punishment imposed upon him; and

e.      To be free from cruel and unusual punishment while in the custody of NYC

DOC.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and prays for the following relief, jointly and severally, against the Defendants:

1. Special and compensatory damages; and

2. Punitive damages; and

3. Reasonable attorney's fees and costs; and

4. Such other and further relief as this Court deems just and proper.

DATED:      New York, New York
             April 19, 2018

Respectfully submitted,

/S/ Kaitlin F. Nares, Esq. (KN2953)
FISHER & BYRIALSEN PLLC
*Attorney for Plaintiff*
99 Park Avenue- PH/26TH FL
New York, New York 10016
(212) 962-0848 Ext 6